MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    E-mail: Jeffrey.b.schenk@usdoj.gov

Attorneys for United States of America

Filed
JUN 0 4 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 12-00888-EJD |
|     Plaintiff, ) | |
| ) | PLEA AGREEMENT |
|   v. ) | |
| ) | |
| JOHN GERINGER, ) | |
|     Defendant. ) | |

    I, John Geringer, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written plea agreement (the "Agreement") pursuant to Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

<u>The Defendant's Promises</u>

    1.    I agree to plead guilty to Counts One, Two, and Twenty-Seven of the captioned Indictment charging me with Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349, Mail Fraud, in violation of 18 U.S.C. § 1341, and Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2. I agree that the elements of 18 U.S.C. § 1349 are as follows:

(1) Two or more persons agreed, in some way or manner, to try to accomplish a common and unlawful plan to commit mail or wire fraud; and

(2) I knew the unlawful purpose of the plan and wilfully joined in it.

I agree that the maximum penalties for 18 U.S.C. § 1349 are as follows:

| | | | |
|---|---|---|---|
| a. | Maximum prison sentence | | 20 years |
| b. | Maximum fine | | $ 250,000 (or twice the gross gain or loss, whichever is greater) |
| c. | Minimum supervised release term | | 3 years |
| d. | Mandatory special assessment | | $100 |
| e. | Restitution | | Determined by the Court |
| f. | Forfeiture | | Criminal proceeds |

I agree that the elements of 18 U.S.C. § 1341 are as follows:

(1) I knowingly made up a scheme or plan for obtaining money by making false promises or statements,

(2) I knew the promises or statements were false,

(3) The promises or statements were material,

(4) I acted with the intent to defraud, and

(5) I used, or caused to be used, the mails to carry out an essential part of the scheme.

I agree that the maximum penalties for 18 U.S.C. § 1341 are as follows:

| | | | |
|---|---|---|---|
| a. | Maximum prison sentence | | 20 years |
| b. | Maximum fine | | $ 250,000 (or twice the gross gain or loss, whichever is greater) |
| c. | Minimum supervised release term | | 3 years |
| d. | Mandatory special assessment | | $100 |
| e. | Restitution | | Determined by the Court |
| f. | Forfeiture | | Criminal proceeds |

I agree that the elements of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5 are as follows:

(1) I knowingly used a device or scheme to defraud someone,

(2) I knew my acts were in connection with the purchase or sale of shares in the GLR Growth Fund, LP,

(3) I directly or indirectly used the mails in connection with these acts,

(4) I acted for the purpose of defrauding buyers or sellers of shares in the GLR Growth Fund, LP.

I agree that the maximum penalties for 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5 are as follows:

| | | |
|---|---|---|
| a. | Maximum prison sentence | 20 years |
| b. | Maximum fine | $ 5,000,000 |
| c. | Minimum supervised release term | 3 years |
| d. | Mandatory special assessment | $100 |
| e. | Restitution | Determined by the Court |
| f. | Forfeiture | Criminal proceeds |

I acknowledge that pleading guilty may have consequences with respect to my immigration status if I am not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, which may include the offenses to which I am pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and I understand that no one, including my attorney or the district court, can predict to a certainty the effect of this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty plea, even if the consequence is my automatic removal from the United States.

I understand that I am pleading guilty to multiple violations and that the Court may order that my sentence for each violation run consecutively.

2. I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true:

In 2002, Chris Luck, Keith Rode, and I established a limited liability company entitled Geringer Luck & Rode, LLC ("LLC") located at 4444 Scotts Valley Drive, Scotts Valley, CA. Additionally, we formed GLR Capital Management LLC, and GLR Growth Fund LP ("Fund"). The LLC was the parent company that paid most of the overhead for GLR Capital Management and the Fund. GLR Capital Management was responsible for paying our salaries.

PLEA AGREEMENT
CR 11-00308 DLJ

Chris Luck, Keith Rode, and I were friends before the establishment of the LLC. I had experience in finance, trading, and insurance, and had the necessary licenses and registrations to manage investments. My primary responsibilities at the Fund consisted of client relations, maintaining client accounts, and allocation of investment funds. Luck had experience in business operations, marketing, and running start-up companies. Luck's primary responsibilities included managing private companies into which the Fund invested (including MediaTile and Digital Delivery Networks, Inc.). Luck also participated in the recruitment of investors into the Fund. On certain occasions, Luck sat down with potential investors and explained to them the reasons why they should invest with the Fund. Rode is and was a Certified Public Accountant, and had experience in accounting and taxes. Rode prepared Fund investor statements, and prepared GLR's tax returns. By combining all of our various skills, we sought to create and manage an investment company. We recruited investors with promises of high returns, with investments divided 75% into equities and 25% into direct company investments.

We formed the Fund in 2003. New investments into the Fund were "locked in" for a twelve months. After that, investors could request withdrawal of all or part of their funds. Investors also had the option of having their investments rolled over for another year. Investors who wanted to withdraw investment funds were required to give GLR written notice sixty days prior to the date the funds would be returned. We recruited new investors solely through word of mouth and referrals.

Prior to 2008, the Fund invested in a combination of stocks and private company investments. However, between 2004 and 2008, Luck encouraged Rode and me to invest increasing amounts of investor money into private companies. After some early success in private company investments, and in line with Luck's wishes, I began to divert more and more investor funds into private companies. Even though we were still representing to potential investors that their investments would be allocated 20% in S&P 100, 20% in S&P 500 Index, 20% in NASDAQ, 15% in Dow Jones 30, and 25% in direct company investments, I began to divert more and more of the Fund into private companies.

Since private company investments generated no returns to the Fund except upon sale, the Fund had less money available for trading. This lack of money created additional pressure on me to generate high returns in the Fund's trading accounts. As a result of this pressure, I began falsifying broker account statements to reflect better performance, hoping this would continue to justify using investor funds for even more private company investments. Based upon my false performance reports, at the end of 2008,

Luck, Rode, and I each took a bonus payment of approximately $1.1 million from the Fund. This cycle of falsified trading gains used to justify increased private company investments continued from 2004 through May 25, 2012, when the Securities and Exchange Commission filed an administrative action against me.

After 2008, following a major liquidation by some significant investors and with worsening economic conditions, I made the decision to invest the Fund exclusively into one of two private companies – MediaTile and Digital Delivery Networks, Inc. ("DDNI"). Both MediaTile and DDNI are located in Scotts Valley. Luck and Rode served on the Boards of Directors for MediaTile and DDNI. Although I believed that the limited partnership agreement empowered me to allocate Fund money as I deemed appropriate based on market conditions, I did not initially disclose this action to Luck, Rode, or the investors.

In or about April 2009, *I.H.*, a Fund investor, requested the return of her $12 million investment into the Fund. Since most of the Fund was invested in DDNI and MediaTile, there were not enough liquid funds to repay her. Then, I knew that I had to reimburse the Fund for the $1.1 million bonus I had taken at the end of 2008, and that I had to disclose the status of the Fund and *I.H.*'s request to Luck and Rode. Shortly thereafter, Luck and I met in person, and we called Rode. During this meeting, I told Luck and Rode that they each needed to repay the $1.1 million bonus they had taken at the end of 2008. Luck and Rode demanded an explanation for my request that they return this bonus. I explained to Luck and Rode the status of Fund, including my falsified broker account statements, *I.H.*'s request, and that we all needed to repay our $1.1 million bonuses. During this meeting, we decided to attempt to negotiate installment payments to *I.H.* Soon after this meeting, on or about April 23, 2009, I drafted and signed a document (hereinafter referred to as my "confession"). In this document, I truthfully wrote that I had "falsified trading statements, reports (both written and verbal) and trades to the GLR Growth Fund, L.P. and GLR Capital Management, LLC." I wrote this document in response to the verbal admission I had recently made to my partners, Luck and Rode.

After my early-2009 confession to Luck and Rode, the three of us had a conversation when we decided that we had a choice to make: we could either report my misconduct to law enforcement or we could attempt to earn the lost money back for our investors. We decided to try to make our investors whole. In choosing this path, we knew that we would need to recruit additional investors. We also

PLEA AGREEMENT
CR 12-00888 EJD                                    4

knew that during this period of recruitment of new investors, beginning in mid-2009, Luck and I would have to and, in fact, did make many false and misleading statements and representations to potential investors. Among these false statements and material omissions, Luck and I led potential investors to believe that the Fund had a positive historical stock market performance, had made and would continue to make diversified equity trades, and would not divert all of an investment into private companies, such as MediaTile and DDNI. Luck and I, even though we made these representations to investors, knew them to be false. We understood that if we were honest with potential investors, many would not invest in the Fund.

Both before and after my confession to my partners, Luck and I provided certain documents to potential investors in order to encourage them to invest in the Fund. I knew, and after my confession in April 2009 I believe that Luck knew, that these new investor materials contained several inaccuracies. For instance, this investment material stated that in 2003 through at least 2009, the Fund asset allocation was: 20% in S&P 100, 20% in S&P 500 Index, 20% in NASDAQ, 15% in Dow Jones 30, and 25% in direct company investments. This asset allocation was no longer accurate after 2008, and Luck and I knew that to be true. Luck and I continued to tell investors that this asset allocation was accurate, because we believed that claiming the Fund provided diverse asset allocation was necessary to causing new investors to invest in the Fund.

Furthermore, I wrote "Member NASD and SEC approved" on the investor materials. I knew that the Fund was not a member of NASD, nor was it approved by the SEC. I understand that by using this language on the investment materials, investors may have felt a false sense of comfort, or been encouraged to invest in the Fund. Also, our investment materials claimed that the Fund was independently audited each year. This, too, was a false statement. I believed that placing this statement on the investment materials would provide a sense of comfort to potential investors, and encourage their investment into the Fund.

Before and after my confession, Rode mailed quarterly statements to each investor and prepared tax statements. After my confession, Rode continued to send to each investor a quarterly statement showing the Fund's investment performance. I believe these account statements were misleading, because they created the false impression among both current and potential investors that the Fund had realized actual and profitable stock market returns; when, in fact, we knew that it had not. The percentage return

PLEA AGREEMENT
CR 12-00888 EJD
5

reported to investors was based solely upon our internal valuation of DDNI and MediaTile, the private companies that the Fund was exclusively invested in at this point. Rode, after learning about my pre-April 2009 falsified broker account statements, failed to send corrected account statements to investors. I believe that Rode knew that doing so would have both caused old investors to demand the return of their investments, as well as prevent us from recruiting any new investors into the Fund. For example, on or about April 27, 2011, Luck, Rode, and I mailed or caused to be mailed a false and misleading account interest statement to an investor with the initials L.B.

In total, I believe the Fund invested between $45 and $50 million into two private companies, MediaTile and DDNI. Neither MediaTile nor DDNI made any payments to the Fund, although the Fund was the largest shareholder in each company. Luck, Rode, and I had hoped to sell MediaTile and DDNI for substantial profits, and use these profits to make all of our investors whole.

3. I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government and to pursue any affirmative defenses and present evidence.

4. I agree to give up my right to appeal my convictions, the judgment, and orders of the Court. I also agree to waive any right I may have to appeal any aspect of my sentence, including any orders relating to forfeiture and/or restitution.

5. I agree not to file any collateral attack on my convictions or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, at any time in the future after I am sentenced, except that I reserve my right to claim that my counsel was ineffective in connection with the negotiation of this Agreement or the entry of my guilty plea. I also agree not to seek relief under 18 U.S.C. § 3582.

6. I agree not to ask the Court to withdraw my guilty pleas at any time after they are entered. I understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I expressly waive any and all rights under Fed. R. Crim. Proc. 11(f) and Fed. R. Evid. 410 with

1  regard to the facts set forth in Paragraph 2 of this Agreement in any such subsequent proceeding. I
2  understand that the government will not preserve any physical evidence obtained in this case.
3       7.      I agree that the Court will calculate my sentencing range under the Sentencing
4  Guidelines. I understand that the Court must consult those Guidelines and take them into account when
5  sentencing, together with the factors set forth in 18 U.S.C. § 3553(a).  I agree that the Sentencing
6  Guidelines offense level will be calculated as follows, although I specifically reserve my right to argue
7  the appropriate loss amount, dispute any adjustment for number of victims, and seek a below-Guidelines
8  sentence based on factors set forth in 18 U.S.C. § 3553(a). I agree that the enhancement for violating
9  Securities Laws applies. I understand that the government may oppose my arguments and, specifically,
10 that it may argue for a loss amount greater than $50 million, and more than 50 victims:

| | | | |
|---|---|---|---|
| 11 | a. | Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| 12 | b. | Specific offense characteristics: | |
| 13 | | Loss Amount, §2B1.1(b)(1) | [to be litigated] |
| 14 | | Victim adjustment, § 2B1.1(b)(2) | [to be litigated] |
| 15 | | Violation of Securities Laws, § 2B1.1(b)(19) | +4 |
| 16 | c. | Acceptance of Responsibility: | -2 or - 3 |

17-20  (If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a two or three-level reduction for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing.)

| | | | |
|---|---|---|---|
| 21 | d. | Adjusted Offense Level: | [to be determined] |

22 I understand that if the government makes and prevails on the two arguments outlined above (regarding
23 loss amount and number of victims), my Adjusted Offense Level would be 36. I also understand that the
24 Court is not bound by the Guidelines calculations above, the Court may conclude that a higher
25 Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask to withdraw my guilty
26 pleas. I also agree that regardless of the sentence that the Court imposes on me, I will not be entitled,
27 nor will I ask, to withdraw my guilty pleas. Although I reserve the right to seek a below-Guidelines
28 sentence based on factors set forth in 18 U.S.C. § 3553(a), I understand that the government is free to

PLEA AGREEMENT
CR 12-00888 EJD                                 7

argue against any such reductions. I agree to be bound by the Court's findings as to the appropriate Guideline calculations.

8.      I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offenses and the sentencing decision. I agree that, based on the nature of the offense, the Court should impose the following special condition of supervised release which is reasonably related to deterrence and rehabilitation:

<u>Special Condition (Searches)</u>

The defendant shall submit his person, residence, office, vehicle, or any property under his control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

9.      I agree to pay restitution for all the losses caused by all the schemes or offenses with which I was charged in this case, and I agree that the amount of restitution will not be limited to the loss attributable to the counts to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I agree that the Court may order and I will pay restitution in an amount of to be set by the Court after consideration of my criminal conduct in this matter, even if not charged and even if not ruled to be "relevant conduct," and any victim impact statements submitted in advance of my sentencing. I agree that any fine, forfeiture, or restitution imposed by the Court against me will be immediately due and payable and subject to immediate collection by the government and I understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the Court or established by the Probation Office. I agree that I will make a good faith effort to pay any fine, forfeiture, or restitution I am ordered to pay. Before or after sentencing, I will upon request of the Court, the government, or the Probation Office, provide accurate and complete financial information, submit sworn statements and give depositions under oath concerning my assets and my ability to pay, surrender assets I obtained as a result of my crimes, and release funds and property under my control in order to pay any fine, forfeiture, or restitution. I agree to pay the special assessment at the time of sentencing.

10. I agree to cooperate with the U.S. Attorney's Office before and after I am sentenced. My cooperation will include, but will not be limited to, the following:

    a. I will respond truthfully and completely to any and all questions put to me, whether in interviews, before a grand jury or at any trial or other proceeding;

    b. I will provide all documents and other material asked for by the government;

    c. I will testify truthfully at any grand jury, court or other proceeding as requested by the government;

    d. I will surrender any and all assets acquired or obtained directly or indirectly as a result of my illegal conduct;

    e. I will request continuances of my sentencing date, as necessary, until my cooperation is completed;

    f. I will not reveal my cooperation, or any information related to it, to anyone without prior consent of the government.

    g. I will participate in undercover activities under the supervision of law enforcement agents or the U.S. Attorney's Office.

11. I agree that the government's decision whether to file a motion pursuant to U.S.S.G. § 5K1.1, as described in the government promises section below, is based on its sole and exclusive decision of whether I have provided substantial assistance and that decision will be binding on me. I understand that the government's decision whether to file such a motion, or the extent of the departure recommended by any motion, will not depend on whether convictions are obtained in any case. I also understand that the Court will not be bound by any recommendation made by the government.

12. I agree not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence; violate the terms of my pretrial release; not to intentionally provide false information or testimony to the Court, the Probation Office, Pretrial Services, or the government; and not to fail to comply with any of the other promises I have made in this Agreement. I agree that, if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises, but I will not be released from my guilty plea.

13. If I am prosecuted after failing to comply with any promises I made in this Agreement, then (a) I agree that any statements I made to any law enforcement or other government agency or in

PLEA AGREEMENT
CR 12-00888 EJD
9

Court, whether or not made pursuant to the cooperation provisions of this Agreement or proffer agreements, may be used in any way; (b) I waive any and all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, to suppress or restrict the use of my statements, or any leads derived from those statements; and (c) I waive any defense to any prosecution that it is barred by a statute of limitations, if the limitations period has run between the date of this Agreement and the date I am indicted.

14. I agree to forfeit my interest in the funds I collected as deposits resulting from my crime (hereinafter "subject property"). I admit that the subject property was proceeds from the offenses to which I am pleading guilty and thus is forfeitable to the United States pursuant to the provisions of 18 U.S.C. § 982; and the procedures outlined in Rule 32.2 of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853. I relinquish any and all right, title, and interest I may have in the subject property and agree that such right, title, and interest can be forfeited to the United States without further notice to me. I also agree I will not contest any administrative or judicial forfeiture proceeding (whether criminal, civil, state or federal) which may be brought against said property. I further agree to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment or that the forfeiture proceeding was brought in violation of the statute of limitations.

15. I agree that this Agreement contains all of the promises and agreements between the government and me, and supersedes any other agreements, written or oral. No modification of this Agreement shall be effective unless it is in writing and signed by all parties.

16. I agree that this Agreement binds the U.S. Attorney's Office for the Northern District of California only, and does not bind any other federal, state, or local agency.

The Government's Promises

17. The government agrees to move to dismiss any open charges pending against the defendant in the captioned Indictment at the time of sentencing.

18. The government agrees not to file any additional charges against the defendant that could

PLEA AGREEMENT
CR 12-00888 EJD                                    10

be filed as a result of the investigation that led to the captioned Indictment.

19. The government agrees not to use any statements made by the defendant pursuant to this Agreement against him, unless the defendant fails to comply with the promises in this Agreement.

20. If, in its sole and exclusive judgment, the government decides that the defendant has cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the Court a motion under § 5K1.1 and/or 18 U.S.C. § 3553 that explains the nature and extent of the defendant's cooperation and recommends a downward departure.

The Defendant's Affirmations

21. I confirm that I have had adequate time to discuss this case, the evidence, and this Agreement with my attorney, and that my attorney has provided me with all the legal advice that I requested.

22. I confirm that while I considered signing this Agreement and, at the time I signed it, I was not under the influence of any alcohol, drug, or medicine.

23. I confirm that my decision to enter this guilty plea is made knowing the charges that have been brought against me, any possible defenses, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement.

Dated: 6/4/14

JOHN GERINGER
Defendant

MELINDA HAAG
United States Attorney

Dated: 6/4/14

JEFF SCHENK
Assistant United States Attorney

I have fully explained to my client all the rights that a criminal defendant has and all the terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all the rights

PLEA AGREEMENT
CR 12-00888 EJD                         11

he is giving up by pleading guilty, and, based on the information now known to me, his decision to plead guilty is knowing and voluntary.

Dated: 6-4-14

_____
WM. MICHAEL WHELAN
Attorney for Defendant

PLEA AGREEMENT
CR 12-00888 EJD                                12